If it pleases the court, I'm John Williams on behalf of Giovanni Adona, the plaintiff appellant. I think this case is the first occasion this court has had since Scott v. Harris to consider the role of video evidence in a police misconduct case. The court below and I think the defendants here have relied heavily, if not exclusively, upon a body cam video produced by one of the defendants apparently. It was a body cam on the body of the defendant, Donston, who himself did not refer to it in his affidavit, but the defendant D'Andrea submitted an affidavit saying that it was a true copy of what had been recorded on Donston's video. The case is obviously very different from Scott v. Harris in two significant, and I submit dispositive, ways. First, in Scott v. Harris, the video indisputably was complete. It was not challenged either as to its completeness nor as to its accuracy. As to the challenge to completeness, this is basically because the plaintiff says what happened isn't what I see on the video? Well, that's part of it, but it's also because when the members of the court look at the video, as I'm sure you have, you can see that the single crucial event relied on by both sides isn't shown. That is, the contact between the plaintiff's body and the wall in question. The defendants So, there's two different possible arguments, and maybe you're making both of them. One is an argument that there is a disputed issue of fact over whether the video is authentic, whether it's been tampered with or cut or somehow does not, it's fake news. Or, alternatively, that the video is fine, it just doesn't capture everything because the video always is from a particular angle and it's sort of dark and that sort of thing. Is that the argument? As I understood it, the plaintiff is saying this is tampered with, this is not an authentic video. Actually, we're making both arguments because both arguments are supported by evidence in the record. But what supports the alteration argument? The plaintiff's sworn claim that it obviously does not depict what happened. And that, I submit, shifted the burden to the party offering this evidence to present evidence of some kind that it was, in fact, unaltered. And that could have been done in either of two fairly obvious ways, either by the affidavit of the officer who had it on his body and a chain of custody, a set of affidavits on chain of custody, or, alternatively, by expert testimony. Neither was attempted by the defense. Well, but it's authenticated by the fact that one of the police witnesses says this is the authentic copy of what actually occurred, what was captured by the camera. That's not what he said. He said this is what, this is an accurate copy of the original. But there was no evidence whatsoever as to whether the original had been tampered with. But I think that perhaps more dispositive is when you actually look at the video, you can see that it doesn't show the contact with the wall upon which both sides rely. It just doesn't show it. But why is the contact with the wall the thing, rather than what the officers do? Well, that's where we have disputed testimony. The officers say, we gently or without using any inappropriate force brought his body into contact with the wall while restraining him. The defendant says, they slammed my body into the wall, inflicting pain. Now, both sides agree he came into contact with the wall, but there's a disagreement about the manner in which that happened. And the video doesn't resolve that dispute. Because it does not resolve that dispute, the court is left to say, look, this is a jury question. We have disputed evidence. We have to find in favor of the nonmoving party. And that's where we are here. And that's the most dramatic reason why this case is nothing like Scott v. Harris. And it seems to me that the defendants and the court below placed an almost talismanic reliance on the fact that, well, there was a video, therefore, nothing to argue about. And that argument does not depend on any claim that the video has been tampered with? That's correct. It does not. Because you can just, you can see by looking at it. The other defendant and the plaintiff contend that both of his arms were seized. You can't really see that. You can see one defendant holding one arm and the other arm. You can't see it all. You don't know what's going on. So it's a dramatically different case from Scott. And I'm not aware of any court, and I know this court, has never taken video to that kind of extreme you're being asked to do in this case. So I submit that Scott is no help to the defense and that we are going to have a very unusual default rule, which is when there's a legitimate dispute about a material fact, the motion should have been denied. And that's the case here. What proof did you offer demonstrating that the video was inaccurate or altered, other than to say that it's inaccurate or altered? Well, it was a sworn testimony of the plaintiff, which is more than the defense offered, because the defense did not offer any contrary evidence. But you see, I don't understand. That's what I don't understand. If your other point is that it doesn't show what, you just can't see what's happening, isn't that inconsistent with the idea that it's been altered? You can see a continuous course of action. You just don't see it all, perhaps, because of the location of the camera or something like that. I'm just puzzled as to why you want to take on this burden of suggesting that the video is not simply incomplete because there may be things that are outside the vision of the camera, but to say that it's actually been tampered with when there's nothing like expert evidence, and to say that it doesn't show something that happened is not the same thing as saying that it's been altered. Well, I agree with that, Judge Lynch, but it just seems to me that this is not a situation where I, as the defending party, have any particular burden. The issue was raised in an appropriate way by the sworn testimony of the plaintiff. It wasn't addressed by the Well, I know, but if I come in and say the photographs are fake, they're fixed, I don't know that that raises an issue of fact. If that raises an issue of fact, then there's an incontestable video. Well, in that respect, what I would say is that, on the contrary, once somebody makes a claim like that under oath, all that's necessary for the other side to do is to come in with some of the kind of appropriate evidence I suggested, chain of custody evidence, expert evidence. It wasn't done yet. I don't need to do that. I don't need to take that burden because when you look at the video, you see that it just doesn't do what the defendants say it does. What was the scope of discovery, if any, during . . . in this matter? I'm sorry? What was the scope or extent of discovery in this case? The extent of discovery was obtaining the underlying videos. We did obtain a total of four videos. Interestingly enough, of those four videos, three of them, the three not involved in this case, were the ones that the plaintiff's mother reported to the jury. I don't think the plaintiff's mother was deposed. No, she was not. Were there any depositions? Yes. The plaintiff was deposed. She was the only person deposed. All right. Thank you. Thank you. You've reserved some time, Mr. Williams. We'll hear from Mr. Tolbert. Good morning. May it please the Court, Counsel. My name is Jim Tolbert, and I represent the defendant appellees Jared D'Andrea, Christopher Donston, and Chad Conroy, all members of the Watertown, Connecticut Police Department. Is it true that there was no evidence that the tape accurately reflected what happened? No, I would disagree with that, Your Honor. The obligation we had was to, under Rule 901 of the federal rules, was to present evidence that the video was what we contended, what we claimed it is. And so we had an affidavit from Officer D'Andrea, who was competent to authenticate that, and who represented in his affidavit it was a true copy of the video, that he was present there, and that Officer Donston had recorded the incident. So in your mind, did that constitute evidence that the video accurately reflected what happened? Absolutely. Under Rule 901, that is all we needed for it to be admissible evidence. And under Rule 56, once we submitted that evidence of the undisputed facts, it's our contention, as the district court I think properly concluded, that if the plaintiff wanted to challenge that based on authenticity or incompleteness, at that point the plaintiff had the obligation to do that, and the plaintiff did not. You would agree that the video is pretty dark, and that the left side of the plaintiff is not observed on the video? Of course I'd concede that, Your Honor. The body-worn camera has limitations. It has a limited scope of view, and so in a dynamic event like this, as the officer is moving around, it has its limitations. And so I would respectfully disagree with Plaintiff Appellant's claim that we relied exclusively on the video. Quite to the contrary, we relied on the totality of circumstances, starting with the 911 call, which, after all, this is an incident that ended not with an arrest, but with an emergency psychiatric evaluation. We had significant evidence in the record, admissions from the plaintiff, his own sworn testimony, that earlier in the day he had in fact made reference to using a baseball bat. That's what prompted the workers on the crisis hotline to call 911 and request a police presence when they went to check on his welfare. Plaintiff admitted that when they arrived, they asked him to stay outside the house, and he turned and tried to reenter the house. Plaintiff admitted it's at that point that he is briefly detained against the wall. Perhaps more significantly even than the body-worn camera, plaintiff admitted that when he was pressed against the wall, his face, his head did not come into contact with the wall. The only part of his body that made contact was his chest. And I would submit that that admission alone refutes the claim, the plaintiff's whole theory of the case, that he was thrown with such force that it almost killed him. That's simply impossible when his face and head didn't hit the wall. What the body-worn camera does is it provides context and adds some color. Plaintiff admitted he had no cuts, no abrasions. He was never handcuffed. He was not punched. He was not kicked. There were no weapons that were drawn. He was taken to the hospital by ambulance at the conclusion of this interaction for an emergency psychiatric evaluation. At the hospital, he was not examined for physical injuries. The three-page police report was part of the record, unopposed, and it corroborates entirely the, what is depicted on the body-worn camera. All of your representations of fact were in the Rule 56 statement submitted to the district court? Yes, Your Honor. And most of those Rule 56 statements were admitted by the plaintiff. Finally, we had the workers from the crisis hotline, Ms. Scherboniak and Mr. Gardner, who can be heard on the recording, not just the video. You can't see them well, but you can hear what happened that day, the threat about the baseball bat. And so what the body-worn camera does is it puts everything in perspective, and it flatly refutes plaintiff's fantastic claim that he was almost killed during this incident. What was the scope of the discovery that you sought? Yes, we deposed the plaintiff. And once I obtained his admissions, with regard, I played the video for him. And, you know, he had this fantastic story that it doesn't show him being thrown against the wall. And that's kind of the point, because it didn't happen, Your Honor. He did testify three times during his deposition that, quote, he almost killed me, he almost took my life away with that brick wall, the guy almost took my life away. That, Your Honor, is a false narrative. I have a question. I'm not interested right now whether it's false or not, but Mr. Williams understandably makes the point that that's a question for a fact finder to make. I'm wondering whether, what are the undisputed material facts that came up in the Rule 56 motion? The undisputed facts, Your Honor, are those primarily that I just recited, that there was no physical injury, no cuts, no abrasions. And I think when you... And the district court had the evidence from the hospital before it? There was no relevant evidence from the hospital. The district court was aware, it was undisputed in the Rule 56 statement that the only treatment at the hospital was for the psychiatric evaluation for no physical injuries. Your Honor, there was an allegation in the complaint that the plaintiff had abrasions and contusions. Again, there was no evidence in the record to support that. So when you look at the body-worn camera, it really just flatly refutes plaintiff's theory of the case. Turning to the law, I would agree with part of what Mr. Williams indicated about there's very little law out there on the body-worn camera. We, our research did not reveal any reported decisions in the Second Circuit in which this court has addressed the utility of a body-worn camera in the police use of force context. It is cutting-edge technology and law. We did cite a 2016 district court decision from the Southern District of California, Emmons v. City of Escondido, primarily because there are some parallels. It's another case, use of force incident captured on a body-worn camera in which an individual on a welfare check tried to close a door. And what's important is that District Judge Jeffrey Miller issued a quite thoughtful and thorough well-reasoned decision, and he noted that while not a panacea, these recordings provide significant color and context to events. They are a technological aid to better serve the community by protecting both police officers and the public because they provide an accurate depiction of contacts between police and the community, provides an objective means for evidence gathering, and serves as a valuable training tool for investigators. Your Honor, we don't suggest that they end every case or that they are a be-all, end-all, but they put things in context, and there's no basis to challenge this video. Both sides here want to make this the great test case of body cameras. But it seems to me that the body camera, as you've acknowledged, doesn't show some of the crucial incidents. And the real point that you're relying on is ultimately the plaintiff's admission at page 49 of his deposition that he didn't have any cuts and wasn't bleeding. Well, I think you have to look at the totality of the circumstances. I mean, I suppose you could get something out of the fact that no one introduces no one, including you, I take it, introduced before the district court any medical records from the hospital. Correct, Your Honor. So there's no affirmative evidence of any physical injury. And there is the dialogue with the defendant. Question, you didn't have any abrasions or cuts as a result of this incident. Correct. Answer, there were no cuts. No. Question, you were not bleeding. Answer, no, I wasn't bleeding, but I hit that wall really hard. Trust me. Is there any other affirmative evidence that there were no physical injuries? No, Your Honor. That's the key here. It can't be excessive force if there's not so much as a bruise that anyone can demonstrate. That is crucial. However, I will say this. This is one of the rare cases. Within three months of the filing of the lawsuit, we moved for summary judgment with our answer and saying that it really did provide more information than you would have. The video provides more information. I agree with that, that it provides more information. But I don't know why either side wants to make this the story of videos either make life so much more easy for everyone or they don't. When the question is what does the video show and what does it not show and what's the rest of the evidence as usual? Well, typically in these use of force cases, quite often we will not move for summary judgment if you have an affiant who swears they were injured. This makes it a much easier call for us to present the evidence to a court. I see my time has expired, so if there are no further questions, we respectfully request that this Court affirm the district court's judgment. Mr. Williams has reserved some time. Thank you, Your Honor. And if we do set aside the video issue and address this case under traditional principles, the reasoning that underlies the view of defense firms such as that involved in this case, that they don't seek summary judgment in unreasonable force cases is precisely that the absence or for that matter the presence of blood or of bruising is not dispositive in an unreasonable force case. Is there any evidence whatsoever that Mr. Adona was injured in any way? Yes. What is that? Mr. Adona testified that he felt pain, that he was thrown against the wall in a very forceful way. And the fact that he felt pain, if there was no reason to use any physical force. Oh, if there's no reason. Now, that's a whole different issue. If there's no reason to use any physical force and your argument is no physical force is permitted, then we're off to the other race that Mr. Talberg wanted to talk about, which is the history of what led up to this incident. But I didn't take that to be the primary position of the plaintiff. I thought the plaintiff was saying even if it was appropriate to use physical force to restrain Mr. Adona from reentering the house, they did too much. But in fact, Mr. Adona's position was that they didn't need to use any force because if they told him not to go in, he wasn't going to go in, that he wasn't given the right to go in. He came out voluntarily. He engaged them in conversation. At no point did he resist in any way, shape or form. That was his testimony. And therefore, to hurl him against the wall, whether or not he suffered injuries, certainly was unreasonable. If you want to say, well, they touched his arm and said, oh, wait a minute, please. Fine. But that's not what anybody claims happens here. What they claim happened here is that he was grabbed from both sides and either placed or thrown hard against the wall. And that amount of force is unreasonable if the circumstances are those that were testified to by Mr. Adona. Whether or not he had made a telephone call to this mental health service saying what do I have to do to get attention down there? Come with a baseball bat. Under the circumstances, it was simply not called for. And therefore, a jury could have determined that it was unreasonable given the usual jury instructions in unreasonable force cases. It's just not appropriate to decide cases like that on summary judgment, and it rarely is done. Thanks very much, Mr. Wood. Thank you. We'll reserve decision.